2003 UT 13

**Tom SNYDER, Plaintiff and Appellant,**

v.

**MURRAY CITY CORPORATION and H. Craig Hall, Defendants and Appellees.**

No. 20010203.

Supreme Court of Utah.

April 11, 2003.

Rehearing Denied July 2, 2003.

Brian M. Barnard, James L. Harris, Salt Lake City, for plaintiff.

Richard A. Van Wagoner, Allan L. Larson, Andrew M. Morse, Salt Lake City, for defendants.

RUSSON, Justice.

¶ 1 This case involves a constitutional challenge by Tom Snyder ("Snyder") to Murray City Corporation's ("Murray City") refusal to allow Snyder to offer a prayer during the opening ceremony of Murray City's municipal council meeting. Snyder appeals the district court's grant of summary judgment in favor of Murray City. We reverse.

## BACKGROUND

¶ 2 Murray City has an established policy and practice of opening its city council meetings with a prayer.

¶ 3 On March 23, 1994, Snyder made a written request for information from Murray City regarding the guidelines or restrictions for giving the opening prayer. Having received no response, on May 9, 1994, Snyder once again inquired about giving the opening prayer.

¶ 4 On June 1, 1994, H. Craig Hall ("Hall"), the city attorney for Murray City, responded to Snyder that "[t]he Municipal Council has not established formal policies regarding the nature and/or content of this reverence portion of their agenda. However, the Council has established the policy that all council meetings will start with prayer." Hall further explained that "[t]he purpose of the 'prayer' is to allow individuals that opportunity to express thoughts, leave blessings, etc. It is not a time to express political views, attack city policies or practices or mock city practices or policies."

¶ 5 By letter, on June 9, 1994, Snyder requested that he be allowed to offer the opening prayer at the next available opportunity and enclosed a copy of his proposed prayer.[1]

---

1. The text of Snyder's proposed opening prayer is as follows:

 OUR MOTHER, who art in heaven (if, indeed there is a heaven and if there is a god that takes a woman's form) hallowed be thy name, we ask for thy blessing for and guidance of those that will participate in this meeting and for those mortals that govern the state of Utah;

 We fervently ask that you guide the leaders of this city, Salt Lake County and the state of Utah so that they may see the wisdom of separating church and state and so that they will never again perform demeaning religious ceremonies as part of official government functions;

 We pray that you prevent self-righteous politicians from mis-using the name of God in conducting government meetings; and, that you lead them away from the hypocritical and blasphemous deception of the public, attempting to make the people believe that bureaucrats' decisions and actions have thy stamp of approval if prayers are offered at the beginning of government meetings;

 We ask that you grant Utah's leaders and politicians enough courage and discernment to understand that religion is a private matter between every individual and his or her deity; we beseech thee to educate government leaders that religious beliefs should not be broadcast and revealed for the purpose of impressing others; we pray that you strike down those that mis-use your name and those that cheapen the institution of prayer by using it for their own selfish political gains;

 We ask that the people of the state of Utah will some day learn the wisdom of the separation of church and state; we ask that you will

¶ 6 On June 30, 1994, Hall informed Snyder that "[t]he text of [his] proposed prayer [was] unacceptable" because it did not comport with "the guidelines set forth in [Hall's] letter dated June 1, 1994." Hall further stated that "[u]ntil your proposed prayer satisfies these guidelines, an invitation to participate in our opening ceremonies will not be forthcoming."

¶ 7 Not long after Murray City rejected his request to offer his prayer, Snyder filed a lawsuit in the United States District Court for the District of Utah. In that lawsuit, Snyder asserted that Murray City had violated his right to due process under the Fourteenth Amendment to the United States Constitution and his rights to freedom of speech and free exercise of religion under the First Amendment to the United States Constitution. In addition, Snyder asserted that Murray City's actions were contrary to the Establishment Clause of the First Amendment to the United States Constitution. Snyder also brought state constitutional claims for denial of due process in violation of article I, section 7 of the Utah Constitution, and denial of free exercise of religion and impermissible establishment of religion pursuant to article I, section 4 of the Utah Constitution.

¶ 8 On September 13, 1995, the federal district court granted Murray City's motion for summary judgment. *See Snyder v. Murray City Corp.*, 902 F.Supp. 1444 (D.Utah 1995). Snyder appealed the federal district court's decision to the Tenth Circuit Court of Appeals. On September 10, 1997, the Tenth Circuit dismissed Snyder's federal law claims but reinstated and dismissed without prejudice his state law claims.[2] *See Snyder v. Murray City Corp.*, 124 F.3d 1349 (10th Cir. 1997).

## PROCEDURAL HISTORY

¶ 9 On August 3, 1999, after the litigation in federal court, Snyder filed the instant lawsuit in Utah district court. In this action, Snyder asserts all of the state constitutional claims dismissed from his prior federal lawsuit and an additional free speech claim pursuant to article I, section 15 of the Utah Constitution.

¶ 10 Both parties moved for summary judgment. The trial court granted Murray City summary judgment, concluding that Snyder's prayer was not afforded protection under *Society of Separationists v. Whitehead*, 870 P.2d 916 (Utah 1993), the free exercise clause, or the establishment clause of the Utah Constitution. In addition, the trial court dismissed Snyder's free speech claim as barred by the statute of limitations. Snyder timely appealed.

¶ 11 On appeal, Snyder argues that the trial court erred as a matter of law in dismissing his free speech claim as barred by a five-year statute of limitations. In addition, Snyder contends that the trial court misapplied *Society of Separationists* in denying his free exercise and establishment clause claims. Finally, Snyder maintains that the trial court erred by failing to properly address his due process claim. The trial court gave only passing attention to the due process claim, having already determined that Snyder's religion clause claims were without merit.

¶ 12 Murray City responds on appeal that all of Snyder's claims, except his state free speech claim, in this lawsuit are barred by principles of res judicata and collateral estoppel in connection with the previously litigated federal lawsuit. Murray City argues that Snyder's free exercise claim was properly

teach the people of Utah that government should not participate in religion; we pray that you smite those government officials that would attempt to censor or control prayers made by anyone to you or to any other of our gods;

We ask that you deliver us from the evil of forced religious worship now sought to be imposed upon the people of the state of Utah by the actions of mis-guided, weak and stupid politicians, who abuse power in their own self-righteousness;

All of this we ask in thy name and in the name of thy son (if in fact you had a son that visited Earth) for the eternal betterment of all of us who populate the great state of Utah. Amen.

2. The Tenth Circuit later heard Snyder's appeal en banc and affirmed its earlier decision. *See Snyder v. Murray City Corp.*, 159 F.3d 1227 (10th Cir.), *cert. denied*, 526 U.S. 1039, 119 S.Ct. 1334 (1998).

denied because the city had no affirmative duty to provide Snyder with a forum in which to exercise his religion and because Snyder did not have a deeply held religious belief in the practice he sought to exercise.

¶ 13 As to Snyder's free speech claim, Murray City contends that Snyder's claim was barred by the statute of limitations and that Snyder waived any argument that the speech violation was ongoing. In addition, Murray City argues that the opening ceremony of the city council meeting is a nonpublic forum which can be properly limited by reasonable, viewpoint-neutral restrictions allowing only legislative prayers.

¶ 14 With regard to Snyder's establishment clause claim, Murray City maintains on appeal that its practice of opening city council meetings with a prayer is consistent with the establishment clause of the Utah Constitution and *Society of Separationists* because the opportunity to deliver the prayer is provided on a religiously neutral basis and thus provides only an indirect benefit to religion.

¶ 15 Finally, Murray City disputes Snyder's due process claim, arguing, among other things, that Snyder was not entitled to due process and that even if he were he was afforded adequate protections.

### STANDARD OF REVIEW

 ¶ 16 "A trial court may properly grant summary judgment when 'there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law.' " *WebBank v. Am. Gen. Annuity Serv. Corp.*, 2002 UT 88, ¶ 10, 54 P.3d 1139 (quoting Utah R. Civ. P. 56(c)); *see also Holmes Dev., LLC v. Cook*, 2002 UT 38, ¶ 21, 48 P.3d 895; *Ault v. Holden*, 2002 UT 33, ¶ 15, 44 P.3d 781; *State ex rel. Div. of Forestry, Fire & State Lands v. Tooele County*, 2002 UT 8, ¶ 8, 44 P.3d 680. "The

propriety of a trial court's grant of summary judgment is a question of law." *WebBank*, 2002 UT 88 at ¶ 10, 54 P.3d 1139 (citing *Holmes Dev.*, 2002 UT 38 at ¶ 21, 48 P.3d 895). "In deciding whether summary judgment was appropriate, we need review only whether the trial court erred in applying the relevant law and whether a material fact was in dispute." *Id.* " 'We thus review the trial court's legal conclusions for correctness, according them no deference.' " *Id.*

 ¶ 17 "Additionally, because interpreting the Utah Constitution presents a question of law, we review the trial court's determination for correctness and give no deference to its legal conclusions." *Grand County v. Emery County*, 2002 UT 57, ¶ 6, 52 P.3d 1148; *see also State v. Casey*, 2002 UT 29, ¶ 19, 44 P.3d 756; *Cache County v. Prop. Div. of State Tax Comm'n*, 922 P.2d 758, 766 (Utah 1996).

### ANALYSIS

#### I. UTAH ESTABLISHMENT CLAUSE CLAIM

¶ 18 On appeal, Snyder argues that this case is controlled by *Society of Separationists v. Whitehead*, 870 P.2d 916 (Utah 1993), and that the trial court erred as a matter of law in applying this court's precedent in that case to the matter at issue in this case. We agree. *Society of Separationists* is controlling authority in the instant case, and the trial court erred in its application and interpretation of that decision here.

¶ 19 In *Society of Separationists*, this court reviewed the constitutionality of Salt Lake City's practice of opening its city council meetings with prayer and upheld that practice as constitutional. In doing so, we concluded that article I, section 4 of the Utah Constitution [3] does not impose an absolute

---

3. Article I, section 4 of the Utah Constitution reads:

The rights of conscience shall never be infringed. The State shall make no law respecting an establishment of religion or prohibiting the free exercise thereof; no religious test shall be required as a qualification for any office of public trust or for any vote at any election; nor shall any person be incompetent as a witness or juror on account of religious belief or the

absence thereof. There shall be no union of Church and State, nor shall any church dominate the State or interfere with its functions. No public money or property shall be appropriated for or applied to any religious worship exercise or instruction, or for the support of any ecclesiastical establishment. No property qualification shall be required of any person to vote, or hold office, except as provided in this Constitution.

ban on government expenditure of public funds or use of public property in support of religion or religious institutions. *Id.* at 937. Instead, a "neutrality" requirement was read into the "no public money or property" language of article I, section 4, and this court concluded:

> The middle ground we [adopt] rests on the concept of governmental neutrality [that] underl[ies] our constitution's religion and conscience clauses, which in this instance means neutrality in the use of public money or property. When the state is neutral, any benefit flowing to religious worship, exercise, or instruction can fairly be characterized as indirect because the benefit flows to all those who are beneficiaries of the use of government money or property, which may include, but is not limited to, those engaged in religious worship, exercise, or instruction.

*Id.*

¶ 20 Having read the neutrality requirement into article I, section 4, this court then went on to set forth the analytical elements of neutrality that must be present in order for a benefit to be found constitutionally indirect and therefore permissible.

> [U]se of public money or property that benefits religious worship, exercise, or instruction or any ecclesiastical establishment qualifies as an indirect benefit and survives constitutional scrutiny only if [ (1) ] the money or property [is] provided on a nondiscriminatory basis [and (2) ] the public money or property [is] equally accessible to all.

*Id.* at 938.

¶ 21 Pursuant to this analytical approach, in *Society of Separationists* it was first determined whether public money or property had been used for religious worship, exercise, or instruction or for the support of any ecclesiastical establishment and then determined whether the benefit from the use of public money or property was direct and therefore constitutionally invalid. We employ the same approach in this case.

■ ¶ 22 In the instant case, the first inquiry is whether Murray City uses public money or property in support of religious worship, exercise, or instruction. *Society of Separationists* held that "the prayerful address of a deity, by its very nature, is a 'religious exercise' [and that therefore] a religious exercise occurs at City Council meetings when prayer is given as an opening thought." *Id.* at 932. Under this court's precedent in *Society of Separationists,* there is no doubt that any prayer offered at the opening ceremony of Murray City's municipal council meetings constitutes religious exercise and that the provision of public funds and property in the execution and furtherance of Murray City's policy and practice of including an opening prayer supports or benefits religious exercise.

■ ¶ 23 The district court in this case, however, concluded that Snyder's proposed prayer did not qualify as a prayer and thus its recitation would not have constituted religious exercise. We disagree.

¶ 24 In *Society of Separationists,* prayer was defined as

> "an address of entreaty, supplication, praise or thanksgiving directed to some sacred or divine spirit, being or object. That it may contemplate some wholly secular objective cannot alter the inherently religious character of the exercise."

*Id.* at 931 (quoting *Karen B. v. Treen,* 653 F.2d 897, 901 (5th Cir.1981), *aff'd mem.,* 455 U.S. 913, 102 S.Ct. 1267, 71 L.Ed.2d 455 (1982)). Here, Snyder's proposed prayer meets this definition. Snyder's prayer begins with an entreaty of a divine being for blessing and guidance for the participants of the council meeting. The fact that the prayer also contemplates that there is no divine being does not prevent it from being a prayer. It then goes on to ask that the participants see the errors of their ways and to follow God's law regarding prayer in public. It asks the divinity to punish the participants if they do not make good decisions and see the error of their ways. All of these requests to the divinity qualify the statement as a prayer. Therefore, the district court erred in concluding that Snyder's proposed prayer was not a prayer and that such a prayer would not be religious exercise under *Society of Separationists.*

¶ 25 The district court also focused on the issue of whether Snyder's beliefs were sincere and whether they were deeply held by him. This is irrelevant for purposes of the definition of prayer and whether prayer is a religious exercise under Utah caselaw interpreting the state constitution's religion clauses. The district court's analysis is drawn from the federal cases analyzing whether a free exercise claim will stand under the federal Free Exercise Clause. In that analysis, the threshold question is whether the plaintiff's beliefs are religious in nature and whether those religious beliefs are sincerely held. This analysis has never been incorporated into our interpretation of our state constitution's religion clauses. Instead, *Society of Separationists* held that "prayerful address of a deity, by its very nature, is a 'religious exercise.'" *Id.* at 932. No inquiry as to the depth or sincerity of belief is required, and the district court erred in incorporating that analysis into its decision.

¶ 26 Having concluded that Snyder's proposed prayer does qualify as a prayer, that the offering of prayer during the Murray City municipal council meeting does constitute religious exercise under article I, section 4 of the Utah Constitution, and that inclusion of prayer at the Murray City municipal council meetings does involve the expenditure of public money or the provision of public property for the support or benefit of religious exercise, we must then determine whether that benefit is constitutionally direct or indirect under our neutrality analysis.

¶ 27 As previously discussed, public money or property that benefits religious worship, exercise, or instruction or any ecclesiastical establishment qualifies as an indirect benefit and survives constitutional scrutiny if it is provided on a nondiscriminatory basis and is equally accessible to all. *Id.* at 938. If Murray City fails to satisfy either of the two elements of the neutrality analytical model, then the benefit of public expenditure provided to religion would not be constitutionally indirect and would violate article I, section 4.

¶ 28 While both requirements of the neutrality test must be satisfied, this case turns on the first element. *Society of Separationists* sets forth the nondiscriminatory basis element of the neutrality requirement. "If a city permits groups to use city-owned facilities, that use must be permitted without regard to the belief system of the user. Lutherans or Latter-day Saints who wish to use the facilities must have access on exactly the same terms as the Loyal Order of Moose, the American Atheist Society, or the Libertarian Party." *Id.* In other words, Murray City is prohibited from examining the content of Snyder's proposed prayer to determine whether the beliefs expressed therein were appropriate or acceptable. Murray City did just that in this case.

¶ 29 Murray City, after reviewing an advance copy of Snyder's prayer, rejected it because it determined that "the text of the proposed prayer [was] unacceptable." Murray City argues that it did not reject Snyder's prayer because it disagreed with his religious beliefs but rather because Snyder's prayer "did not fall within the subject-matter restriction which the City has properly placed on the Opening Ceremony." The imposition of a "subject-matter restriction" for the reverence portion of Murray City's municipal council meeting agenda invites Murray City to review the contents of prayers and subjectively determine whether a particular "subject" is appropriate or acceptable. This constitutes nothing more than content, or belief, control by another name. At times, it is nearly impossible to distinguish the political from the religious in the course of prayer. One person's political manifesto is another person's prayer.

¶ 30 Here, the use of public money or property for facilitating the giving of opening prayer at the Murray City municipal council meeting was not made on a nondiscriminatory basis, that is, "without regard to the belief system of the [prayer]." *Id.* at 939. Murray City's rejection of Snyder's prayer was discriminatory in that the rejection was made after a review of the prayer's content and was based upon Murray City's disagreement with the beliefs expressed therein. Because Murray City's means of selecting those entitled to offer the prayer at the opening of its city council meetings was not nondiscrimina-

tory, and therefore not neutral, the city's practice of opening its meetings with prayer constitutes a direct benefit to the exercise of religion and violates article I, section 4's prohibition that "[n]o public money or property shall be appropriated for or applied to any religious worship, exercise or instruction...."

¶ 31 For the foregoing reasons, the district court erred in granting summary judgment to Murray City. If Murray City chooses to continue to open its city council meetings with prayer, it must strictly adhere to the neutrality requirements set forth herein and in *Society of Separationists*. Under those neutrality requirements, Snyder should be allowed to offer his prayer.

## II. RES JUDICATA AND COLLATERAL ESTOPPEL

¶ 32 Murray City also argues on appeal that certain claims and issues brought by Snyder in this action were litigated in the prior federal court action and thus are barred by the legal doctrine of res judicata or collateral estoppel. We disagree.

¶ 33 " 'The doctrine of res judicata serves the important policy of preventing previously litigated issues from being relitigated.' Res judicata encompasses two distinct doctrines: claim preclusion and issue preclusion." *See Miller v. USAA Cas. Ins. Co.*, 2002 UT 6, ¶ 57, 44 P.3d 663 (quoting *Salt Lake City v. Silver Fork Pipeline Corp.*, 913 P.2d 731, 733 (Utah 1995), and citing *Macris & Assocs., Inc. v. Neways, Inc.*, 2000 UT 93, ¶ 19, 16 P.3d 1214).

¶ 34 "Generally, 'claim preclusion bars a party from prosecuting in a subsequent action a claim that has been fully litigated previously.' " *Miller*, 2002 UT 6 at ¶ 58, 44 P.3d 663 (quoting *Culbertson v. Bd. of County Comm'rs*, 2001 UT 108, ¶ 13, 44 P.3d 642). In order for a claim to be precluded under this doctrine the party seeking preclusion must establish three elements:

"First, both cases must involve the same parties or their privies. Second, the claim that is alleged to be barred must have been presented in the first suit or be one

that could and should have been raised in the first action. Third, the first suit must have resulted in a final judgment on the merits."

*Miller*, 2002 UT 6 at ¶ 58, 44 P.3d 663 (quoting *Macris & Assocs.*, 2000 UT 93 at ¶ 20, 16 P.3d 1214) (further citation omitted).

¶ 35 On the other hand, issue preclusion " 'arises from a different cause of action and prevents parties or their privies from relitigating facts and issues in the second suit that were fully litigated in the first suit.' " *Macris & Assocs.*, 2000 UT 93 at ¶ 19, 16 P.3d 1214 (quoting *Schaer v. State*, 657 P.2d 1337, 1340 (Utah 1983)) (further quotation omitted). The doctrine of issue preclusion applies where the party seeking preclusion establishes the following four elements:

"(i) [T]he party against whom issue preclusion is asserted must have been a party to or in privity with a party to the prior adjudication; (ii) the issue decided in the prior adjudication must be identical to the one presented in the instant action; (iii) the issue in the first action must have been completely, fully, and fairly litigated; and (iv) the first suit must have resulted in a final judgment on the merits."

*Collins v. Sandy City Bd. of Adjustment*, 2002 UT 77, ¶ 12, 52 P.3d 1267 (quoting *In re Rights to Use of All Water*, 1999 UT 39, ¶ 18, 982 P.2d 65).

¶ 36 Snyder's claims and associated issues are not barred by the doctrine of claim or of issue preclusion because neither the claims brought in this suit nor the issues involved were the subject of a final judgment on the merits. In the instant action, Snyder has alleged constitutional claims under the Utah Constitution only. While these claims, with the exception of the free speech claim, and associated issues were also brought in his previous federal action, those claims ultimately were dismissed without prejudice by the Tenth Circuit Court of Appeals. In ordering the dismissal of Snyder's state law constitutional claims, the Tenth Circuit explained:

We have held that when federal claims are resolved prior to trial, the district

court should usually decline to exercise jurisdiction over pendent state law claims and allow the plaintiff to pursue them in state court. *See Ball v. Renner*, 54 F.3d 664, 669 (10th Cir.1995). We believe this general practice is particularly appropriate in this case.

The Supreme Court of Utah recently rejected a challenge to Salt Lake City's practice of opening its city council meetings with a prayer. *Society of Separationists v. Whitehead*, 870 P.2d 916 (Utah 1993). While that challenge was brought under the provision of Utah's Constitution which prohibited the expenditure of public monies for religious purposes and not under its Free Exercise or Establishment Clauses, the Supreme Court of Utah stated in *Society of Separationists* that it would not follow federal constitutional models in interpreting the Religion Clauses of the Utah Constitution. *Id.* at 930, 931 n. 36. Given that the interpretation of those Clauses appears to be undergoing an evolution, and given the complex issues of state law presented, we decline to exercise supplemental jurisdiction over Mr. Snyder's state-law claims.

*Snyder v. Murray City Corp.*, 124 F.3d 1349, 1354–55 (10th Cir.1997).

¶ 37 Therefore, Snyder's constitutional claims under the Utah Constitution are not barred by principles of res judicata and were properly before the district court for adjudication.

 ¶ 38 Finally, in the context of res judicata, Murray City asserts that the Tenth Circuit held that Murray City's allowing Snyder to offer his prayer would have violated the federal Establishment Clause because the Tenth Circuit determined that Snyder's prayer fell outside of the genre of legislative prayer in that the prayer was proselytizing and disparaging to religion. This is incorrect. The Tenth Circuit noted only that Murray City did not violate the federal Establishment Clause by denying Snyder the opportunity to offer his prayer. It did not hold that were Murray City to allow Snyder to offer his prayer it would be violating the federal Establishment Clause. That claim or issue was never decided by the Tenth Circuit.[4]

### III. FREE SPEECH, FREE EXERCISE, AND DUE PROCESS CLAIMS

¶ 39 Because our analysis and decision regarding Snyder's establishment clause claim under the Utah Constitution is dispositive in this case, we need not reach Snyder's free speech, free exercise, and due process claims.

### CONCLUSION

¶ 40 For the foregoing reasons, the district court erred as a matter of law in granting summary judgment to Murray City, and the district court's decision is reversed.

¶ 41 Chief Justice DURHAM and Associate Chief Justice DURRANT concur in Justice RUSSON'S opinion.

¶ 42 Justice WILKINS concurs in the result.

¶ 43 Judge BENCH dissents.

---

4. We need not concern ourselves with such an issue as it is not before us. This case does not require us to interpret the federal Establishment Clause. Interpretation of the Utah Constitution only is at issue in this case. As we noted in *Society of Separationists*, when we interpret the religion clauses of the Utah Constitution, we do not rely on federal caselaw interpreting the religion clauses of the United States Constitution. *See Society of Separationists v. Whitehead*, 870 P.2d 916, 931 n. 36 (Utah 1993) ("We, however, decline to adopt [the federal test for interpreting the federal establishment clause] as our analytical model for the Utah Constitution, which is more detailed than its federal analogue and allows less room for the rather free interpretation that the United States Supreme Court has given the federal constitution's First Amendment.") Furthermore, and more specifically, we refused to rely on the United States Supreme Court's analysis of the constitutionality of legislative prayer under the federal Establishment Clause in deciding whether that practice would pass constitutional muster under the Utah Constitution. *See id.* at 930 ("While we agree that the [United States Supreme Court's decision upholding the constitutionality of legislative prayer, *Marsh v. Chambers*, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983),] might control here if the [Salt Lake City] Council's practice were being challenged as a violation of the federal constitution, it does not control our analysis under the Utah Constitution, with its broader and more detailed prohibitions.").

¶ 44 Justice HOWE did not participate herein; Court of Appeals Judge RUSSELL W. BENCH sat.